---------------------------------------------------------------- X
LIBERTY MUTUAL INSURANCE              :
COMPANY,                              :
                                      :
                      Plaintiff,  :  MEMORANDUM
                                      :  AND ORDER
   - against -                     :
                                      :  06 CV 3433 (JG)
GRAND TRANSPORTATION, INC.,           :
ARIEL TRANSPORTATION CORP.,           :
LARGE AUTO BROKERAGE, INC., and       :
LEON GAVRIEL d.b.a. LARGE AUTO        :
BROKERAGE,                            :
                                      :
                    Defendants.  :
---------------------------------------------------------------- X

A P P E A R A N C E S :

    BENNETT, GIULIANO, MCDONNELL & PERRONE, LLP
        225 West 34th Street, Suite 402
        New York, NY 10122
    By:    Jeffrey R. Krantz
        Attorneys for Plaintiff

    GATHMAN & BENNETT, LLP
        191 New York Avenue, Suite 202
        Huntington, NY 11743
    By:    John C. Bennett
        Attorneys for Defendants Large Auto Brokerage, Inc. and Leon Gavriel

JOHN GLEESON, United States District Judge:

        Liberty Mutual Insurance Company ("Liberty") is a participant in the New York Automobile Insurance Plan ("the Plan"), by which automobile insurance providers doing business in New York are assigned the underwriting risk of applicants unable to obtain insurance in the voluntary market. Defendants Grand Transportation, Inc. ("Grand") and Ariel Transportation Corp. ("Ariel") are owner-operators of commercial transportation companies.

Defendant Large Auto Brokerage, Inc. ("Large Auto") is a licensed insurance broker certified by the Plan.[1]

Liberty brings this action alleging that the defendants, seeking an artificially low premium rate, misrepresented key facts in an application for insurance submitted to the Plan and assigned by the Plan to Liberty. Liberty claims breach of contract (by Grand), negligent and intentional misrepresentation (by Large Auto and Grand), and unjust enrichment (of Ariel). Large Auto moves to dismiss Liberty's claims of negligent and intentional misrepresentation pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.[2] Large Auto argues that (1) the Plan precludes a participant insurer's common law right of action against an insurance broker for misrepresentation, and in the alternative (2) the complaint does not sufficiently allege negligent or intentional misrepresentation.[3] For the reasons discussed below, the motion is denied.

## BACKGROUND[4]

Liberty is a Massachusetts corporation licensed by the State of New York to issue and service commercial motor-vehicle liability insurance policies. Compl. ¶ 2. The Plan compels Liberty, like all licensed motor-vehicle insurers in New York, to assume the underwriting risk for a proportionate share of the state's high-risk insurance applicants whose

---

[1] Defendant Leon Gavriel, the sole shareholder of Large Auto, is sued in his individual capacity. I refer to Large Auto and Gavriel collectively as "Large Auto."

[2] Large Auto's notice of motion indicates forum non conveniens as an additional basis for dismissal. Large Auto's papers do not prosecute that rationale, however, and at oral argument counsel disclaimed reliance upon it.

[3] Large Auto also argues that Liberty fails to establish a claim for punitive damages.

[4] I assume the facts set forth -- which are taken from the complaint -- to be true for the purposes of Large Auto's motion to dismiss.

applications have been refused in the voluntary market. *See id.* ¶¶ 11, 13; *see also* N.Y. Ins. Law. § 5301(a) (providing that "[a]ll insurers licensed to write motor vehicle insurance in this state" shall assume an "equitable apportionment . . . of applicants for [motor vehicle] insurance who are in good faith entitled to [*sic*] but are unable to procure it through ordinary methods").

Five characteristics of the Plan are relevant to the motion before me. First, the Plan requires insurance brokers to ensure that their clients' applications are complete and accurate to the best of the broker's knowledge. *See* Compl. ¶ 37; *see also* Plan Sec. 15A(1)(a); *id.* Sec. 15A(1)(c). Second, the Plan is centralized: licensed insurance brokers submit applications to the Plan, and the Plan in turn assigns the applications to a servicing carrier (*i.e.*, a participant insurer). *See id.* ¶¶ 11, 12, 16. Accordingly, a broker does not know ahead of time which participant insurer will accept the broker's application. *See id.* ¶ 17. Third, the Plan is compulsory: a servicing carrier cannot refuse an assigned application. *See id.* ¶ 13. Fourth, the Plan requires insurers to audit their assigned risk. *See* Plan Sec. 15(16)(c) (providing that a Plan insurer must "[c]onduct an underwriting review of each taxi/limousine risk . . . to confirm usage, location, and drivers"); *see also Panepinto v. Allstate Ins. Co.*, 439 N.Y.S.2d 240, 242 (Sup. Ct. 1981) ("[T]he New York State Automobile Insurance Plan imposes upon the insurer the obligation to promptly investigate the risk.") (citing *Aetna Cas. & Sur. Co. v. O'Connor*, 8 N.Y.2d 359, 364 (1960)). Accordingly, while a carrier's initial premium estimate is generated entirely from information provided in the application by the insurance broker, *see* Compl. ¶ 16, once the policy is issued, the carrier will investigate the assigned risk and re-rate the premium, if necessary. *See id.* ¶ 32; *see also id.* ¶¶ 25, 31 (describing Liberty's investigation and re-rating in this case). Fifth, Plan premiums for public automobile transportation companies depend upon,

3

*inter alia*, the number of vehicles covered, the location and radius of the operation of the vehicles, and the classification of the vehicle's use. *See id.* ¶ 14.

Liberty alleges that Large Auto submitted an application for motor vehicle insurance on behalf of Grand to the Plan; the Plan, in turn, assigned the risk to Liberty. *Id.* ¶ 18. Grand's application represented that it operated an airport limousine service headquartered in White Plains, New York. *Id.* ¶ 19. Large Auto stated in the application that it had "read the New York Automobile Insurance Plan, [had] explained the provisions to [Grand], and [had] included in th[e] application all required information given to Large Auto by [Grand]." *Id.* ¶ 36.

As required, Liberty issued a one-year policy for Grand, with premiums calculated by reference to the claimed geography and classification. *See id.* ¶ 21. The policy provided that this premium was an estimate, subject to possible change after Liberty's audit of the representations in the application. *Id.* ¶ 32. Before that audit, two additions were made to the policy. First, on the request of Large Auto and Grand, Liberty endorsed Ariel as an additional insured. *Id.* ¶ 22. Second, on the request of Grand through Large Auto, Liberty added additional Ariel vehicles to the policy. *Id.* ¶ 23.

Liberty alleges that Large Auto "knew, or should have known," that Liberty would issue its policy at an improperly low rate "based on the information contained in the applications." *Id.* ¶ 51. In the alternative, Liberty alleges that Large Auto submitted misrepresentations "with the intent to induce Liberty Mutual to issue the respective insurance policies at a substantially lower rate then [*sic*] would have been charged if Grand Transportation and Large Auto had truthfully and accurately disclosed" the relevant information. *Id.* ¶ 56.

Once Liberty investigated its assigned risk, it discovered that Grand actually operated a "for hire" transportation service, not an airport limousine service, which was

4

headquartered in metropolitan New York, not White Plains. *See id.* ¶¶ 20, 25. Plan premium rates for airport limousine service classifications and operations headquartered in White Plains are lower than rates for "for hire" services in metropolitan New York. *See id.* ¶¶ 20, 30. Accordingly, Liberty re-rated the insurance policy issued to Grand. *Id.* ¶ 31.

Out of the re-rated premium of $441,974, plus $205 and $15 in assessments and fees, Grand has paid only $184,397.30. The outstanding amount of $257,796.70 remains due, and Grand "has failed and/or refused [to pay] any additional premiums." *Id.* ¶ 44.

## DISCUSSION

Liberty claims that because Large Auto knew (or should have known) that Grand did not in fact operate an airport limousine service in White Plains, Large Auto is liable in tort for misrepresenting the classification and geography of Grand's operation on the application Large Auto submitted to the Plan. Liberty argues that Large Auto breached its duty to ensure that Grand's application was "fully completed" with the "necessary information to rate and write the policy." Plan Sec. 15A(1)(a); *see also id.* Sec. 15A(1)(e) ("All statements of fact submitted to the Plan or an assigned company must be to the best of the producer's[5] knowledge").

Large Auto takes the position that it need not account to Liberty for negligent or intentional misrepresentation because (1) the Plan precludes those causes of action and (2) Liberty fails to allege that Liberty and Large Auto were so closely linked as to functionally be in privity with one another.

---

[5]  Brokers such as Large Auto are termed "producers" by the Plan.

A. *The Standard of Review of Large Auto's Motion To Dismiss*

A motion to dismiss tests the legal, not the factual, sufficiency of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted)). For the purposes of the motion, I accept the factual allegations in Liberty's complaint as true, and draw all inferences in its favor. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005), *cert. granted*, 126 S. Ct. 2965 (2006). I may not grant the motion unless it appears beyond doubt that Liberty can prove no set of facts that would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

B. *Large Auto's Preclusion Argument*

Under New York common law, an insurer can recover from an applicant the damages it incurred by issuing a policy based upon the applicant's misrepresentations. *See Mooney v. Nationwide Mut. Ins. Co.*, 172 A.D.2d 144, 149 (3d Dep't 1991) ("[A] suit by an insurer against its insured to recover damages the insurer was obligated to pay to an injured third party as a result of the insured having fraudulently obtained the insurance is cognizable.") (citing *Reliance Ins. Cos. v. Daly*, 38 A.D.2d 715, 716 (2d Dep't 1972)); *Liberty Mut. Ins. Co. v. McClellan*, 127 A.D.2d 767, 770-71 (2d Dep't 1987) ("[O]ur holding in no way prevents [the insurer] from seeking redress against its insured for any losses incurred as a result of its

misrepresentation.") (citing *Daly*, *supra*); *Daly*, *supra*, ("[N]othing in the applicable law precludes a suit for damages after the insurer's responsibilities to a third party have been satisfied."). Brokers are not immune from this private right of action, should they breach their common law "duty to supply correct information to the insurer and to make full disclosure of the nature of the risk" in an application for insurance. *Panepinto*, 439 N.Y.S.2d at 242.

Large Auto maintains that Liberty cannot advance a misrepresentation action against the broker in this case, however, because the policy in question was issued pursuant to the Plan. According to Large Auto, the Plan "has established a detailed set of regulations governing the rights and liabilities of parties entering into Assigned Risk Contracts which *supplant* . . . not supplement common law rules regarding insurance contracts." Defendants' Brief in Support of Their Motion To Dismiss ("Br.") 2. As support for its preemption[6] argument, Large Auto points to *Aetna Casualty and Surety Co. v. O'Connor*, 8 N.Y.2d 359 (1960).

In *Aetna*, the New York Court of Appeals held that the Plan abrogates an insurer's common law right to rescind a policy due to an applicant's misrepresentation. 8 N.Y.2d at 364. "[T]he Plan impl[ies] an intention to limit the insurer, if fraud and misrepresentation be charged, to the right to cancel on 10 days' notice as specified in Section 18." *Id.* at 363; *see also id.* at 363-64 (Plan Sections 19 and 20 contemplate a right to cancel but not a right to rescind). The Court of Appeals reasoned that such a "detailed and comprehensive set of regulations governing the rights and liabilities of the parties entering into assigned risk insurance contracts" would have provided for a rescission remedy had such a remedy been

---

[6] At times, Large Auto characterizes the argument as one of "standing." *See* Br. 2. Large Auto does not appear to dispute the propriety of Liberty as a plaintiff in this action, however. Rather, its argument is that "[n]o private right of action against [a Plan] broker is afforded to [a Plan] insurer." *Id.*

7

intended. *Id.* at 362; *see also id.* at 363 ("[T]he Plan is broad in scope, containing 22 sections . . . . The very range of the subjects included reflects a design to supply an exclusive and comprehensive scheme of regulation of the contractual relationship concerned."). The court also found that the availability of rescission would violate "[t]he compulsory character of the carrier's participation in the Plan." *Id.* at 363-64.

By analogy to *Aetna*, Large Auto argues that because the Plan does not explicitly provide for it, "no private right of action against the broker" for misrepresentation "is afforded to the insurer" under the Plan. Br. 2. I do not read *Aetna* to support that conclusion. *Aetna* held that the Plan comprehensively defines the rights and duties of its participants with respect to relief on Plan contracts. Accordingly, when the Plan omits a remedy that background contract law would otherwise supply -- *e.g.*, the rescission remedy -- that omission means the remedy is not available. But *Aetna* nowhere holds that an insurer lacks a right of action *in tort* when the subject matter of the tort happens to be a Plan-assigned policy.[7] *See Aetna*, 8 N.Y.2d at 363 (concluding the Plan "suggest[s] a concern for the entire range of duties and obligations *which comprise the assigned risk contract*") (emphasis added); *id.* (concluding the Plan "reflects a design to supply an exclusive and comprehensive scheme of regulation *of the contractual relationship concerned*") (emphasis added). At stake here is a tort action: Liberty's right to compensation for an economic injury caused by Large Auto's tortious behavior does not flow from a contractual relationship; indeed, the parties agree that Large Auto was not a party to the insurance contract. I therefore decline to adopt Large Auto's position that the Plan's failure to

---

[7] As discussed *infra*, New York courts long ago unyoked tort liability from the strict boundaries of privity.

mention that insurers can recover in tort for misrepresentations by brokers implies that such recovery is unavailable in this case.

Large Auto argues that the Plan's omission of a private right of action is significant in light of the Plan's mechanisms to investigate and suspend, or even expel, errant brokers. *See* Plan Secs. 11-3, 15, 27. This argument is not persuasive. The Plan's procedures to deal with bad-apple brokers reflect a different concern -- the need to remedy harm to the Plan as a whole. A private cause of action, on the other hand, remedies harm to an individual insurer that has been victimized by an applicant's misrepresentation.

Moreover, if Large Auto's suggestion were correct, Plan officials could suspend or revoke the certification of errant brokers, *see* Plan Sec. 15, but such brokers could keep their ill-gotten gains so long as they shielded their misconduct from discovery during the insurance carrier's audit. To be sure, insurers must conduct prompt and proper investigations of their assigned risk, *see Aetna*, 8 N.Y.2d at 364-65, but in Large Auto's world, a broker skilled enough to help a client successfully cheat an audit could never be held to account by an insurer forced to pay when an accident occurs.

An insurer's private right of action for misrepresentation avoids this perverse result, at no cost to the Plan's core protection of "innocent injured third parties." *Id.* at 364. Once an accident has occurred, a damages action by an insurer affects only the allocation of loss between insurer and applicants (broker and/or insured) -- it does not affect the ability of an injured person to recover from the insurer. Moreover, the availability of such an action does not meaningfully diminish the insurer's incentive "to discover fraud at the earliest possible moment, before an accident occurs," *id.*, as a pre-accident investigation followed by an administrative re-

9

rating is far more efficient than a post-accident investigation followed by a fraud lawsuit. As the Appellate Division has written,

> Just as the public interest is not disserved by a suit brought by the insurer against its insured who fraudulently procured the policy, neither is it disadvantaged if the insurer is relieved of a claim asserted against it by such an insured. If it is established . . . that [the insured] acquired his policy by fraudulent means, denying [the insured] the right to recover would not impinge in any way upon the protection the policy accords innocent victims . . . and would comport with elementary fairness.

*Mooney*, 172 A.D.2d at 149; *see also Ins. Co. of N. Am. v. Kaplun*, 274 A.D.2d 293, 298-99 (2d Dep't 2000) (quoting *Mooney*, *supra*); *Daly*, 38 A.D.2d at 716 ("Th[e] public interest is unaffected by a suit for damages which in no way impinges on the injured party's recovery.").

Finally, at least one New York court has held that a Plan insurer can raise a misrepresentation claim as a defense to an action by an insured to recover benefits under a policy issued pursuant to the Plan. *See Kaplun*, 274 A.D.2d at 298-99. *See also Liberty Mut. Ins. Co. v. Ben's Luxury Car & Limousine Serv., Inc.*, No. 06 Civ. 3430 (ERK), at 7-9 (E.D.N.Y. Feb. 15, 2007) (holding that the Plan does not preclude a misrepresentation claim by an insurer against a broker); *N.Y. Auto. Ins. Plan v. All Purpose Agency & Brokerage, Inc.*, No. 97 Civ. 3164(KTD), 1998 WL 695869, *7 (S.D.N.Y. Oct. 6, 1998) (granting insurers' summary judgment motion against brokers for common law fraud).

Large Auto presents no authority for its argument that the Plan precludes a misrepresentation action by an insurer. The decision of the New York State Supreme Court, Monroe County in *Panepinto v. Allstate Insurance Co.*, 439 N.Y.S.2d 240 (Sup. Ct. 1981), is not such a case. *Panepinto* held that a Plan insurer cannot recover damages for the fraud of a Plan broker when the insurer breached its duty to promptly investigate its assigned risk. 439

N.Y.S.2d at 243. That holding is inapposite, as it was Liberty's investigation that uncovered Large Auto's alleged misrepresentation in this case.[8]

I conclude that the Plan does not preclude a misrepresentation cause of action by an insurer against a broker or insured.[9]

B.      *Large Auto's Functional Privity Argument*

Under New York law, a cause of action for negligent misrepresentation "requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Ossining Union Free Sch. Dist. v. Anderson*, 73 N.Y.2d 417, 419 (1989). Large Auto argues that Liberty has alleged no such relationship between insurer and broker in this case. Liberty does not contend that a relationship of contractual privity exists, just "the functional equivalent" thereof.

The New York Court of Appeals has long been concerned with cabining the breathtaking possibilities for liability in negligence cases involving economic injury. *See generally Gen. Motors Corp. v. Villa Marin Chevrolet, Inc.*, No. 98-CV-5206 (JG), 2000 WL 271965, at *22-*26 (E.D.N.Y. 2000 Mar. 7, 2000). In *Ultramares Corp. v. Touche*, 255 N.Y. 170 (1931), Chief Judge Cardozo held that a public accounting firm owed no duty of care to third parties not in privity with the firm who were damaged by their reliance upon the firm's inaccurate financial statements. As the Court of Appeals wrote in *Ossining Union Free School*

---

[8] Moreover, certain language in *Panepinto* indicates that the court recognized that a Plan insurer can, in the absence of the insurer's proximate cause of its own damages, recover damages "limited to the difference between the actual premiums and the premiums which should have been paid." 439 N.Y.S.2d at 242.

[9] Large Auto contends that allowing a cause of action against an insurance broker would "hold a Broker liable as a surety for an alleged contractual breach by an insured." Br. 7. But Liberty does not seek recourse against Large Auto as a surety; it seeks only a remedy for Large Auto's tortious involvement in Grand's scheme to defraud Liberty.

11

*District v. Anderson*, 73 N.Y.2d 417, 424 (1989), Cardozo "chose to circumscribe defendants' liability for negligent misstatements by privity of contract or its equivalent, because of concern for the indeterminate nature of the risk" assumed by the accounting firm in that case. "[T]he range of potential plaintiffs was 'as indefinite and wide as the possibilities of the business that was mirrored in the [firm's] summary,'" such that "'a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Ossining*, 73 N.Y.2d at 423 (quoting *Ultramares*, 255 N.Y. at 174, 179-80).

Fearing such border-free liability, the Court of Appeals has "declined to adopt a rule permitting recovery by any 'forseeable' plaintiff who relied on [a] negligent[] [statement]," and has declined to adopt the "somewhat narrower rule that would permit recovery where the reliant party or class of parties was actually known or foreseen by the defendants," in favor of "something more." *Id.* at 424-25 (citations omitted). That something more has been "articulated . . . in various ways," *id.* at 425, including "reliance by the plaintiff that was 'the end and aim of the transaction,'" *id.* (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 238-39 (1922)), and, most recently, a tripartite test involving "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance," *Parrot v. Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 484 (2000) (citations omitted).

Under either version of the test, Liberty's allegations establish a functional equivalent of privity. Large Auto submitted an application on behalf of Grand to the Plan, with the expectation that a Plan carrier would use it to issue a policy at an estimated premium rate

12

calculated from the information in the application. Furthermore, Large Auto knew or should have known that the rating information on the application was false. The "end and aim" of the submission of the application was to represent facts that would trigger the assigned carrier to issue a policy at an improperly favorable rate. Furthermore, on the facts alleged, (1) Large Auto knew that the application would be used by a participant insurer to issue a policy at an improperly favorable rate (indeed, it was "the very purpose of [Large Auto's] engagement," *Ossining*, 73 N.Y.2d at 425, to induce a rating that relied upon the application); (2) Liberty, as an insurer participant in the Plan, issued a policy based upon the application at a rate calculated in reliance upon the statements by Large Auto and Grand; and (3) it was Large Auto that set forth the false statements in the application and submitted it to the Plan for assignment to a Plan carrier.

Large Auto argues that Liberty alleges no "reliance by a known party," because, due to the centralized assignment of risk in the Plan, "there is no manner by which the Defendant could have been aware of the identity of the carrier before the application was submitted." Br. 8. This argument mistakenly supposes that the test for functional privity requires the defendant to know ahead of time which specific individual or entity will rely on its statement. Large Auto offers no support for this proposition in the caselaw. Moreover, because the "class" of insurer participants in the Plan is not "indeterminate," *Ultramares*, 255 N.Y. at 179, concerns of indeterminate risk do not warrant Large Auto's immunization from liability. To the contrary, the liability of a Plan broker for misrepresentation is liability for a determinate amount (*i.e.*, "the difference between the actual premiums and the premiums which should have been paid," *Panepinto*, 439 N.Y.S.2d at 242) for a determinate time (*i.e.*, only so long as the policy remains

13

in effect) to a determinate class of one (*i.e.*, the Plan participant insurer to whom the policy was assigned).[10]

## CONCLUSION

For the foregoing reasons, the motion to dismiss is denied in full.[11]

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       March 12, 2007

---

[10] Large Auto submits an additional miscellany of arguments, all of which lack merit. For example, Large Auto argues that Liberty cannot allege reliance because the Plan compelled it to accept the risk "regardless of what information may be supplied by the broker." Br. 9. Of course, the claimed misrepresentations and corresponding reliance go not to the issued policy but the rates of that policy. Large Auto further argues that the effect of its alleged misrepresentations was only the generation of an improper *estimated* premium, which was subject to change by Liberty. To this extent this argument suggests that Liberty's own negligence is the proximate cause of its damages, a motion to dismiss is not the occasion to consider such a factual claim. Similarly, Large Auto's argument that it did not breach its duty to provide information to the best of its knowledge is a factual claim inappropriate to the motion before me.

[11] Large Auto asks that I reject Liberty's punitive damages claim as a matter of law because Liberty does not allege conduct rising "to a level of high moral culpability aimed at the public generally." Br. 10. "[A] private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613 (1994). At oral argument, the parties revealed that numerous similar claims have been filed against Large Auto in state court and this district. I cannot conclude at this stage that no jury could find Large Auto's actions were not directed at the public generally.

14